UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| IMS HEALTH INCORPORATED<br><br>Plaintiff,<br><br>v.<br><br>PETER DWAYNE HARBIN<br><br>Defendant. | Civil Action No. _____ |

## COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

IMS Health Incorporated ("IMS," "Plaintiff" or "Company"), by and through its undersigned counsel, hereby brings the following Complaint against Defendant Peter Dwayne Harbin ("Harbin" or "Defendant") seeking injunctive relief and damages.

### PRELIMINARY STATEMENT

1.      IMS has initiated this action to prevent Harbin, a former high-ranking IMS senior manager, from causing IMS irreparable harm by violating his binding restrictive covenants with IMS and performing services for a direct competitor, Veeva Systems Inc. ("Veeva").

2.      The need for this relief is critical.  Harbin is intimately familiar with critical details pertaining to IMS's products and key strategic businesses in Business Intelligence, Customer Relationship Management, Master Data Management and Marketing Campaign Management.  There is no conceivable way that he can perform his new job for Veeva without compromising IMS's confidences.

3.      Harbin has also served as one of IMS's key faces to its customers and the market with respect to technology and applications.  While meeting directly with clients on

behalf of IMS and developing both relationships with customers and reputation in the market, Harbin received the benefit of IMS's goodwill, which – absent relief – he will now be able to use for the benefit of a key IMS competitor.  Harbin's face-to-face access with customers was both high-level and substantial; by his own admission, in 2013 alone, Harbin presented 16 thought leadership presentations to a wide-variety of clients (often at the Chief Information Officer level) on behalf of IMS.  There is no conceivable way that knowledge of Harbin's employment at a key competitor, let alone any actual client-facing role or client-engagement strategy role Harbin may have, will not harm IMS.

4.     Shortly before his resignation, Harbin was a member of small group of senior managers who met to strategize and role play how to respond to Veeva in the marketplace. At these meetings, Harbin and others specifically analyzed IMS's weaknesses and strengths compared to Veeva and formulated strategies to challenge Veeva in the areas where Harbin has subject matter expertise.  These meetings are recent, Harbin's role was significant and the competitive focus was Veeva.  There is no credible way that Harbin can claim that he does not retain knowledge from these sessions, nor is there a credible way that Harbin can faithfully serve Veeva without disclosing the confidential information from these sessions.

5.     In consideration for significant additional compensation and eligibility in various IMS incentive compensation plans, Harbin entered into two separate restrictive covenant agreements in 2008 and 2013 with IMS, both of which independently preclude him from competing against the Company for a one-year period following his separation from IMS.  In these agreements, Harbin acknowledged that IMS would provide him access to trade secrets and confidential information by virtue of the position of trust to which IMS had assigned him, and that he was prohibited from disclosing or relying upon this information for any purpose other

than the benefit of IMS.  These reasonable and limited restrictions provided assurances to IMS that its trade secrets and confidential information would only be used for legitimate purposes. The restrictive covenants were likewise meant to ensure that Harbin and any subsequent employer, such as Veeva, would not be able to benefit at the expense of IMS by gaining access to Harbin's knowledge of IMS's products and market strategies in the same commercial space.

6.     Harbin fully understood the non-compete obligations to which he agreed when he entered into these restrictive covenant agreements.  Harbin, in fact, retained the 2013 agreement for over a year after receiving it without returning the agreement to IMS, attempted to negotiate its terms and only signed it when he was advised that it was required for him to do so in exchange for the right to exercise phantom stock rights that netted him approximately $82,000.  In fact, he submitted the executed 2013 Restrictive Covenant Agreement in April 2014, thirteen months after receiving it and shortly prior to announcing that he had accepted employment with Veeva.

7.     At the time of his abrupt resignation to go to work for a direct competitor, Harbin was among the top 2% of employees in the Company (out of approximately 9,900) in terms of title and base compensation, signifying his considerable responsibilities and the trust IMS placed in him.  Harbin served as a General Manager for IMS's Information Management and Business Intelligence Services business.  In that role, Harbin played a key role in pursuing and subsequently integrating several key acquisitions that compete directly against Veeva, particularly with respect to cloud-based services.  IMS pursued these acquisitions for the purpose of being more competitive in the market spaces in which Veeva has a significant presence, and the acquisitions and subsequent integrations were done with the explicit intent of bolstering IMS's presence in these markets.

8.      On May 20, 2014, Harbin informed IMS that he would be terminating his employment with IMS effective as of June 2, 2014.  In giving his resignation, Harbin originally made no mention of accepting employment with Veeva, let alone disclosing his anticipated job duties.  Indeed, even afterwards, when requested to provide details of what he would be doing for Veeva, Harbin provided no specificity.

9.      Tellingly, the same day of Harbin's resignation, Veeva issued a Press Release touting a new cloud-based offering that would directly compete with IMS offerings, including the very offerings for which Harbin had – and has – detailed knowledge.  IMS has subsequently learned that Harbin holds the position of Vice President, Commercial Cloud Strategy, for Veeva.  Upon information and belief, Harbin's job duties for Veeva would necessarily, if not inevitably, compete with the functions he performed for IMS.  Harbin would necessarily, or inevitably, rely upon the trade secrets and confidential information IMS entrusted to him as an employee.

10.     Harbin's failure to disclose his job duties coupled with his new position at Veeva demonstrates both his intent to flout the terms of the agreements he signed and his unwillingness to cooperate with IMS to ensure that its trade secrets and confidential information are protected.  IMS's need for immediate and effective injunctive relief is particularly compelling in light of the job duties Harbin performed for the Company.

11.     On June 30, 2014, IMS initially acted to protect its trade secrets and confidential business information through the initiation of an action in Canada (the "Canadian Action") by its Canadian subsidiary seeking to enforce a restrictive covenant agreement entered into by Harbin and the subsidiary in 2008 (the "Canadian Agreement").  On July 21, 2014, the Canadian court ruled that there was a fact question – raised by Harbin and Veeva – as to whether

a separate Restrictive Covenant Agreement entered into directly between IMS and Harbin in 2013 (the "2013 Restrictive Covenant Agreement") controlled, and, based on that concern, declined to enforce the non-competition provision of the Canadian Agreement.  The Canadian court, however, stated that if it is the 2013 Restrictive Covenant Agreement that controlled, then that would be for a court in Connecticut to decide.  Consistent with the Canadian court's direction, IMS initiates this action to enforce the agreements Harbin entered directly with the Company and to protect the goodwill it has generated with its customers and prevent Harbin from inevitably disclosing IMS's trade secrets and confidential information in the performance of his job duties for a direct competitor.

12.     IMS's need for immediate and effective injunctive relief is a direct result of Harbin's actions.  IMS thus brings this action to prevent Harbin from causing irreparable harm to the Company by flouting contractual obligations he possessed by performing work for Veeva and unfairly competing against IMS.

## JURISDICTION AND VENUE

13.     Jurisdiction is proper due to the express consent of Harbin, pursuant to the terms of Section 7(b) of Harbin's executed Restrictive Covenant Agreement, dated March 19, 2013 (the "2013 Restrictive Covenant Agreement"), attached hereto as Exhibit A, and pursuant to the terms of Section 7(b) of Harbin's executed Restrictive Covenant Agreement, dated October 10, 2008 (the "2008 Restrictive Covenant Agreement"), attached hereto as Exhibit B.

14.     Venue is proper in the District Court pursuant to the terms of Section 7(b) of the 2013 Restrictive Covenant Agreement and Section 7(b) of the 2008 Restrictive Covenant Agreement.

15.     The District Court has subject matter jurisdiction over all counts pursuant to 28 U.S.C. §1332 since the amount in controversy in the present action exceeds the sum or value of seventy five thousand dollars ($75,000.00), exclusive of interests and costs, and there exists complete diversity of citizenship, as Plaintiff is a corporate citizen of Delaware and Connecticut and Harbin is a citizen of Canada.

## THE PARTIES

16.     Plaintiff IMS Health Corporation is a Delaware corporation with its principal place of business at 83 Wooster Heights Road, Danbury, Connecticut  06810.

17.     Defendant Peter Dwayne Harbin is an individual and a citizen of the Canada, residing at 4290 Couples Crescent, Burlington, Ontario L7M 4Y8, Canada.  During his employment with IMS, Harbin resided during the workweek at an IMS-provided apartment in Princeton, New Jersey.

## FACTUAL ALLEGATIONS

**A.     IMS's Business and The Company's Reliance on Trade Secrets and Confidential Information to Drive Its Success.**

18.     IMS is a leading global information, services, and technology company dedicated to improving healthcare.  IMS helps its customers improve patient outcomes and operate more efficiently by providing clients with real-world evidence, advanced analytics, and proprietary software platforms.  IMS's customers include, but are not limited to, hospital systems, pharmaceutical, medical device and consumer health manufacturers and distributors, healthcare providers, payers, government agencies, policymakers, researchers, and the financial community.  IMS partners with its customers to provide evidentiary-based data to help generate improved customer outcomes.  IMS markets its products throughout the United States and internationally.

19.     There are several general categories of trade secrets and confidential information relevant to this action.  In particular, Harbin possesses extensive knowledge of IMS's BI, CRM, MDM and MCM businesses, all of which have been developed through great capital investment by IMS and are described in detail directly below.  Specifically, Harbin was intimately involved in the pursuit and integration of several acquisitions by IMS designed to bolster their product offerings in each of these market sectors, and the subsequent contribution of those acquisitions to the development of a central integration platform (i.e., IMS One).  Harbin's involvement included, but is not limited to, presenting to the board and senior leadership teams of IMS, helping develop the business strategy for these acquisitions, participating in strategy sessions directly addressing how to respond to Veeva in the market, and otherwise playing an important role overseeing other IMS employees in the integration efforts.  Harbin's involvement extended to integrating these product offerings and businesses into a new, cloud-based solution for IMS's customers titled "IMS One."  These individual business lines and the IMS One offering compete directly with Veeva.

20.     Harbin is aware of trade secrets and confidential information regarding a number of important facets of IMS's business including, but not limited to, the following:

a.     Business Intelligence ("BI") is used to analyze an organization's information and is comprised of several related activities, including data mining, online analytical processing, querying and reporting.  IMS's Business Intelligence offering is branded under the name "Performance Analytics."  IMS and Veeva are competitors in BI.

b.     Customer Relationship Management ("CRM") systems allow for the management of a company's interactions with current and future customers.  CRM involves using technology to organize, automate and synchronize sales, marketing, customer service, and

technical support.  CRM systems track and measure marketing campaigns over multiple networks.  They can be used to help find customer profiles as well.  In 2013, IMS, through acquisitions and internal development, sought to expand in life sciences CRMs by virtue of a strategy that Harbin helped design and execute.  IMS and Veeva are competitors in CRM.

c.      Master Data Management ("MDM") is the practice of acquiring, improving, and sharing master data.  MDM involves creating consistent definitions of business entities via integration techniques across multiple internal IT systems.  An MDM tool can be used to support master data management by removing duplicates, standardizing data, and incorporating rules to eliminate incorrect data from entering a system in order to create an authoritative source of master data.  Master data are the products, accounts and parties for which the business transactions are completed.  MDM systems are meant to provide processes for collecting, aggregating, matching, consolidating, quality-assuring, and distributing such data throughout an organization to ensure consistency and control in the ongoing maintenance and application use of this information.  MDM systems are meant to eliminate problems related to business unit and product line segmentation, in which the same customer will be serviced by different product lines, with redundant data being entered about the customer and account in order to process the transaction.  IMS and Veeva are competitors in MDM.

d.      Marketing Campaign Management ("MCM") focuses on the practical application of marketing techniques and the management of a company's marketing resources and activities.  MCM influences the level, timing, and composition of customer demand as it allows companies to more effectively manage their marketing campaigns through the effective use of data.   IMS and Veeva are competitors in MCM.

e.      Data Warehousing & Cloud Hosting via IMS One.  IMS One is IMS's cloud-based information delivery platform that provides customers insight into information, integrated applications, and data that customers can have confidence is clean, secure, and standardized.  IMS One provides three key services to IMS customers:  1) data as a service; 2) platform as a service; and 3) master data management as service.  "Data as a service" provides customers with scalable, adaptable, cloud-based data from which they can quickly process and integrate data from multiple sources.  "Platform as a service" is an application platform that provides seamless, connected and accessible information that allows customers to access key information needed to inform their data-driven decisions and actions.  Lastly, "Master data management as a service" provides a clean, secure platform from which broad swaths of customer data can be managed and maintained.  There is no dispute that IMS and Veeva are competitors in providing cloud-based services.

**B.      IMS Protects its Trade Secrets and Confidential Information to Drive Its Success.**

21.      IMS recognizes the tremendous value of its trade secrets and confidential information and takes steps to protect access to such information.  IMS has in place policies, including a business conduct policy, that require employees to keep its business information confidential and prohibits employees from using its information for any purpose other than the benefit of IMS.  These policies are available on the Company intranet to which all IMS employees have access.

22.      IMS also requires employees to acknowledge their confidentiality obligations and requires certain key employees, such as Harbin, to enter into restrictive covenants preventing them from competing with the Company for a limited time so that IMS's competition does not receive the benefit of its trade secrets and confidential information.

23.     IMS also physically restricts access to their facilities both for third-parties and for their employees.  IMS facilities are not generally open to the public.  Access to IMS facilities is controlled through a card-swipe system and/or through a receptionist.  Third-parties are only allowed access to the section of the IMS facility related to their legitimate business. IMS employees also do not have unfettered access to all IMS facilities but are generally restricted to the facility in which they work, unless there is a legitimate business reason for broader access.

24.     IMS restricts access to its on-line systems and information technology on an as-needed and password protected basis.  IMS controls and limits which employees have permission to access its databases to employees who have a legitimate business purpose for such access.  For example, absent a specific reason and then only for a limited time, an employee in accounts payable would not have access to the sections of IMS's servers that house the databases it analyzes for its customers.  IMS further protects its electronic business information through the use of encryption services and firewall protections.

25.     In sum, IMS recognizes the importance of its trade secrets and confidential information and takes appropriate steps to protect them.

**C.     Harbin's Initial Job Responsibilities at IMS and Exposure to Its Trade Secrets and Confidential Information.**

26.     Immediately prior to being employed by IMS, Harbin was employed by Skura Corporation ("Skura").  In or around October 2008, IMS acquired a portion of Skura's business in the health care space and Harbin became employed by IMS Health Canada, Inc. ("IMS Canada"), a wholly-owned subsidiary of IMS.  Indicative of his high-level role, Harbin's acceptance of employment with IMS, including entry into an Employment Agreement and 2008 Restrictive Covenant Agreement, was a key condition to closing the acquisition.  Prior to

commencing his employment with IMS, Harbin entered into the 2008 Restrictive Covenant Agreement at Exhibit B.

27.     The 2008 Restrictive Covenant Agreement was entered into directly between IMS and Harbin.  It prohibited Harbin, during his employment and for one year thereafter, from being employed or performing services for another company that competes with the Company.  See Ex. B at § 1.

28.     From approximately 2008 until 2012, Harbin's title at IMS was Senior Principal.  During that time period, his job duties focused on data integration, consulting and business intelligence services.  Harbin's duties in these areas were significant and had a deep impact on IMS's offerings.  By way of example, Harbin authored IMS's BI offering, Performance Analytics, coordinating each step from the presentation of its business case and market opportunity across IMS management to its go-to-market strategy with customers.

29.     In addition, Harbin managed IMS's MDM business until early 2012. Accordingly, he was familiar with and possessed a great deal of information related to IMS's MDM business strategy, including its tactics, offerings, strategic partnerships, pricing, personnel, technology platform and functionality, and developmental plans.

30.     In his role as Senior Principal, Harbin's job responsibilities included oversight of teams that analyzed large volumes of data supplied in part by IMS and in part by the customer, and extracted insights from that data about market trends, market opportunities, and performance indicators.

31.     Reflective of his significant responsibilities, Harbin led a team of 9 direct reports and approximately 85 indirect employees in these activities while serving as Senior Principal.

32.     Harbin spent the vast majority of his time while working for IMS performing his job duties with a focus on the United States – as reflected in the fact that he lived in the United States in IMS-provided housing during much of his tenure at IMS.

33.     While serving as Senior Principal, Harbin spent the work week residing at an apartment in Princeton, New Jersey, which was paid for by IMS.  Harbin resided at the apartment with several other IMS employees.  Harbin spent the vast majority of his time while working for IMS performing his job duties in the United States.

**D.     Harbin Enters Into a New Restrictive Covenant Agreement In Connection with a Significant Promotion That Places Him at the Top 2% of IMS Employees and Immerses Him in Much of the IMS Businesses that Compete Directly with Veeva.**

34.     In or about December 2012, Harbin was promoted to General Manager (Level 9) for IMS's Information Management and Business Intelligence Services business ("IMBI").  IMS's IMBI business includes offerings directly competitive with those of Veeva.

35.     As a Level 9 General Manager, Harbin was placed in a high-ranking position at IMS.  In fact, out of IMS's approximately 9,900 employees worldwide, only 189 (or less than 2%) are classified at equivalent or higher levels.  By way of further reference, the highest level of employee at IMS is a Level 10.

36.     At the time of Harbin's promotion to Level 9 General Manager, Lisa Kerber advised Harbin that he would receive an additional 90,000 Phantom Stock Options in IMS, contingent on approval by IMS's Compensation Committee in the first quarter of 2013.

37.     In conjunction with his promotion to a Level 9 General Manager, Harbin was presented the 2013 Restrictive Covenant Agreement with the Company on March 19, 2013.  Ex. A.  Harbin was advised at the time of his promotion that it was necessary for him to execute the Agreement in order to be eligible to receive the Phantom Stock Options.

38.     In May 2013, when Harbin had not yet executed the 2013 Restrictive Covenant Agreement, a representative of IMS's human resources department followed up with him and Harbin raised some concerns about signing the Agreement by email and did not execute the agreement at that time.

39.     However, in April 2014, after further follow-up, Harbin provided IMS an executed 2013 Restrictive Covenant Agreement.  He did so after being advised that it was required in order to exercise his Phantom Stock Options that netted him $82,000.

40.     At the time that Harbin executed his 2013 Restrictive Covenant Agreement, he was well aware of the breadth of overlap between IMS's and Veeva's product and service offerings.

41.     The 2013 Restrictive Covenant Agreement was entered into directly between IMS and Harbin.  It prohibits Harbin, during his employment and for one year thereafter, from being employed or performing services for another company that competes with the Company, stating as follows:

> [D]uring the Employee's employment by or service with IMS and continuing for the period ending one year after termination of all employment and services with IMS, howsoever arising, (hereinafter also referred to as 'the Restrictive Period'), Employee shall not directly or indirectly:
>
> a)  perform or provide any Services for any Competitive Organization;
>
> b)  perform or provide any Services that are competitive, in whole or in part, with any Covered IMS Offering; or
>
> c)  perform or provide any Services for any Person that would reasonably desire to use Employee's knowledge or IMS confidential or trade secret information or where the use or disclosure of such information is reasonably likely.

See Ex. A at § 1.  "Competitive Organization" is defined as follows:  "any Person that is then planning to develop, developing, providing, offering or supporting any product or service that is

competitive, in whole or in part, with any Covered IMS Offering." Id.  A "Covered IMS Offering means any IMS Offering (A) with which the Employee was involved in any way, (B) that was offered or supported in any way by the Business Unit of IMS for or with which the Employee provided Services, or (C) as to which Employee had access to IMS confidential or trade secret information." Id.

42.     The 2013 Restrictive Covenant Agreement further prohibits Harbin, during his employment with the Company or any time thereafter, from disclosing IMS's confidential information. See id. at § 3.  Harbin agreed "not to disclose confidential information of IMS to anyone outside of IMS" and not to "use such information for his or her own personal benefit." Id. at § 3.  Harbin further agreed "to make every reasonable effort to (a) ensure the confidentiality and integrity of confidential information of IMS and (b) protect it against reasonably anticipated threats or hazards to its security or integrity." Id.  Confidential Information is defined as follows:

> [I]nformation not generally known outside IMS.  Examples of confidential information include, but are not limited to, non-public technical knowledge of methodologies, computer programs, and work processes of IMS; business information regarding costs, profits, sales, licensing arrangements, markets, and customer lists of IMS; knowledge of future activities within IMS, such as products or services in research and development or marketing plans; data obtained or created from sources outside IMS; and information provided to IMS by a third party which IMS has agreed to keep confidential.

Id. at § 3.

43.     Defendant further acknowledged that the 2013 Restrictive Covenant Agreement was necessary to "protect the interests of IMS and its confidential information, and the information of its customers, data suppliers, prospective customers and other companies with which IMS has a business relationship which IMS is required to maintain in confidence, and in

consideration of the covenants and promises and other valuable consideration described in this Agreement . . ." Id.

44.     The 2013 Restrictive Covenant Agreement is reasonable in its temporal and geographic scope.

45.     As General Manager for IMBI, Harbin developed detailed knowledge of the Company's CRM and MCM businesses to complement his BI and MDM expertise from his prior IMS position.  In fact, throughout 2013, Harbin played a significant role in the evolution of IMS's business towards technology applications, the core of which are the very segments that Veeva operates.

46.     During 2013, IMS made several acquisitions in the technology and applications field, including of Appature, Inc. and 360 Vantage, LLC.  Prior to its acquisition, Appature was a cloud-based software company used by health care companies to track and enhance marketing campaigns.  Prior to its acquisition, 360 Vantage was a provider of cloud-based multi-channel CRM and closed loop marketing ("CLM") technologies.  As with Veeva's CRM offering, 360 Vantage's CRM platform is built off of Salesforce.com.

47.     Harbin participated in multiple strategy discussions and was an important contributor in connection with the integration of the Appature offerings into IMS's technology and application product suite.  Harbin was aware of and otherwise participated in activities including pricing discussions, market planning, technology and product feature reviews.  Harbin further contributed to the strategy of Appature's integration into IMS and the development of its application to better serve IMS's customers.

48.     Harbin was also involved in the decision to acquire 360 Vantage and develop the broader technology platform to compete with Veeva.  He was heavily involved with

the internal strategy of acquiring 360 Vantage and developing the CRM offering.  In fact, Harbin presented the business case for the 360 Vantage acquisition and related technology development to IMS's Board of Directors and CEO, the principal subject matter of which was presenting the business case for more effective competition with Veeva.  Harbin was part of a select team of less than 10 IMS senior managers on the 360 Vantage due diligence team that evaluated IMS's potential acquisition of the Company and expansion into CRM.

49.     Harbin also was deeply involved in the post-acquisition integration of 360 Vantage into IMS.  Harbin led the US Delivery & Client Service integration team, and also served on the Product Marketing Strategy and US Demand Generation teams.

50.     The four-member US Delivery & Client Service integration team's responsibilities included implementation services and CRM Operations, conducting gap analysis for IMS and 360 Vantage, developing rate cards, and developing the strategy for team integration.

51.     The five-member Product Marketing Strategy integration team's responsibilities included defining the overall product direction, defining market positioning and creating messaging to compete against other CRM vendors (including, explicitly, Veeva), developing a roadmap for the internationalization of the product, and developing branding concepts.

52.     The three-member US Demand Generation integration team's responsibilities included developing rules of engagement with customers for IMS and 360 Vantage, aligning the companies, providing leadership for key deals, and consolidating the pipeline for potential business.

53.     As Harbin was deeply involved in the acquisition of 360 Vantage and its integration into IMS, he is aware of a significant amount of information about IMS's go to market strategy, technology platform, offerings (present and future), personnel, and pricing.  As described above, Harbin was a key member of the strategic team that dealt with all aspects of 360 Vantage at IMS and routinely attended meeting and strategy sessions about 360 Vantage and IMS's expansion into CRM.

54.     Through his responsibilities in connection with 360 Vantage and Appature, Harbin learned and contributed to the development of trade secrets and confidential information related to IMS One, IMS's cloud-based applications suite, which integrates the many cloud-based offerings provided by IMS, including leveraging its acquisitions of 360 Vantage and Appature.  IMS One is IMS's customer-facing, key initiative for which it has invested in the hundreds of millions of dollars in developing and bringing to market.

55.     Harbin also continued to play a key role in the development of IMS's MDM opportunities.  Harbin was the highest-ranking employee in the United States with expertise in MDM, and – because of his knowledge of technology and applications – was regularly involved in MDM strategy and technical discussions.

56.     Harbin also gained detailed knowledge of IMS's offerings in the various product lines for which he had responsibilities.  Harbin's knowledge includes, but is not limited to, pricing strategy, technical capabilities, and marketing approaches.  Importantly, Harbin understands the strengths and weaknesses of these products, and would be able to share that knowledge with colleagues at Veeva or directly with customers to the detriment of IMS.

57.     In his General Manager position, Harbin also gained knowledge of IMS's acquisition strategy, including targets whose acquisitions are still pending or are in the

exploratory phase.  This information is highly sensitive, the knowledge of which by a competitor could be used to proactively disrupt IMS's growth strategy or inform the competitor's own strategic plans.

58.     In his General Manager position, Harbin also had significant customer-facing opportunities.  By Harbin's own admission in his 2013 Self-Evaluation, Harbin developed and delivered 16 thought leadership presentations on data, technology, and applications to customers, often to the customer's senior management, during 2013 alone.

59.     Harbin served as IMS's customer ambassador on "Big Data" in the healthcare market, as part of IMS's initiative to build relationships at the Chief Information Officer level.  In his market-facing responsibilities, Harbin would speak and present at industry events, giving him additional opportunities to develop a reputation with customers through his job responsibilities for IMS.  As a result, through his employment with and on behalf of IMS, Harbin has presented himself to large healthcare customers – including many of the customers over whom IMS and Veeva compete – as a leader on big data issues.  Further, in preparation for these thought leadership presentations, Harbin was able to seek out and learn IMS's strategic thinking on data, technology, and applications, as well as develop that strategy on IMS's behalf.

60.     In 2014, Harbin's customer-facing responsibilities increased.  By his own admission, through a sworn Affidavit in the Canadian Action, Harbin's travel schedule in 2014 was much more affected by customer demands, reflecting his valuable role with respect to IMS's customers.  Harbin cannot claim that he has not meaningfully interacted with customers nor that he has gained insight into their needs through the performance of his responsibilities for IMS. The bulk of Harbin's time was spent in conjunction with direct interactions with IMS customers and prospects.

61.     Harbin's decision to live in Princeton, New Jersey during the work week – which he continued to do as General Manager – reflects the significant customer-facing responsibilities he had as both a Senior Principal and General Manager.  IMS maintained an apartment in Princeton, and permitted Harbin to live there, because of its proximity to key pharmaceutical clients in the New Jersey and Pennsylvania markets.  In other words, Harbin lived in Princeton (where IMS does not maintain any offices) precisely so he could have easy access to IMS's customers.

62.     In short, Harbin was the face of IMS for many customers – an opportunity that Harbin would not have been afforded but for his promises not to compete that he has now broken.

63.     By virtue of his client-facing and other strategic responsibilities and as an internal authority on technology issues, Harbin understood the strengths and weaknesses of IMS's relationships with its key customers, regardless of whether he had direct contact with the customer.  Harbin understands which relationships are secure, which relationships are uncertain, and – for the uncertain relationships – the issues that have caused that uncertainty.  It is inconceivable that he would not use this information on behalf of Veeva.  Indeed, he must use this information – whether intentionally or subconsciously – if he intends to serve his new employer loyally.  Moreover, Veeva now can capitalize on IMS's goodwill in the marketplace by presenting Harbin, who has burnished his reputation in competitive market spaces through the investment of IMS, all the while Harbin is supposed to be abiding by his covenants not to compete.

64.     After his promotion to General Manager, Harbin continued to perform his job duties primarily in the United States.   Residing at the IMS Princeton apartment, Harbin would frequently work out of IMS's Plymouth Meeting offices.

**E.     Harbin's New Employer, Veeva, is a Direct Competitor of IMS In the Areas Where Harbin Has Knowledge of IMS's Trade Secrets and Confidential Information.**

65.     Veeva is a direct competitor of IMS, as evidenced through multiple products and offerings that overlap between the companies.   Veeva describes itself as possessing "ground-breaking products for [CRM] and regulated content management" with "over 190 customers, ranging from the world's largest pharmaceutical companies with thousands of users to emerging biotechnology companies that are commercializing their first product." http://www.veeva.com/meet-veeva/  (last visited July 29, 2014).   "Veeva's products are all cloud-based" and focus on achieving "the fastest time to value through the deployment of fully functional applications . . ."  Id.

66.     Of particular relevance, Veeva has two major categories of offerings that substantially overlap with IMS offerings: Veeva CRM and Veeva Network.

67.     Upon information and belief, Veeva CRM is a cloud-based application marketed to pharmaceutical and biotechnology companies to manage and track interactions with healthcare providers.   It is built on the CRM platform provided by Salesforce.com, it is hosted by Veeva, and accessed by its customers online.   The information used by Veeva CRM is supplied, in part, by a separate application called Veeva CLM, which is used by pharmaceutical companies to gather feedback of physician's responses to promotional materials.

68.     Veeva CRM competes directly with IMS CRM, which is marketed under the trade name of Nexxus Sales/Engage.   Veeva acknowledges in its most recent annual report that Veeva CRM competes with IMS.

69.     Upon information and belief, Veeva Network is an MDM application that manages a database of information about healthcare professionals and healthcare organizations. In 2013, Veeva acquired AdvantageMS, a company in the business of collecting and selling this type of data, and Veeva now packages the data along with the software to manage it in its Veeva Network offering.   As a result of Veeva's acquisition of AdvantageMS, the IMS and Veeva MDM offerings became more direct competitors given that both include a proprietary reference data asset to complement its MDM services.

70.     Veeva Network directly competes with IMS MDM, which trades as MDMaS, a fact that Veeva admits in its latest annual report.

71.     Finally, it is indisputable that Veeva's Commercial Cloud competes directly with IMS's One/IMS Nexxus.

72.     Veeva has acknowledged that it competes with IMS, particularly after IMS's aforementioned acquisitions with which Harbin was deeply involved.   Specifically, prior to IMS's acquisition of 360 Vantage, Veeva used IMS for implementation services in connection with its CRM offerings.   However, after IMS acquired 360 Vantage, Veeva stopped using IMS for implementation services, presumably because IMS was entering CRM.

73.     Conversely, after IMS acquired Appature, Veeva enhanced its CLM service offering to better compete with IMS's Appature-based MCM offering.   Accordingly, Veeva entered into more direct competition with IMS in the MCM field.

74.     In 2013, Veeva also entered into the MDM business through its acquisition of a company called Advantage MS.   Accordingly, Veeva's purchase of Advantage MS further increased competition between the two companies.

75.     Veeva's growing involvement in the BI, MCM and MDM markets explain its interest in hiring Harbin.  This hire, and Harbin's duties related to BI, CRM, MCM and MDM, will permit Veeva to skip or reduce the additional time and monetary investment needed in developing products in these areas because it can rely upon Harbin's knowledge gained at IMS.  This will allow Veeva, through Harbin, to gain sales at IMS's expense because it will not have to make the significant investment of additional resources to learn what works and what does not work.

**F.      Shortly Before His Resignation, Harbin Was a Key Participant in Strategy Meetings Where the Subject Was Competing with Veeva.**

76.     The irreparable harm caused by Harbin's employment with Veeva is not limited to Harbin's detailed knowledge of IMS's offerings and the customer relationships he has developed on behalf of IMS.  Harbin also knows IMS's specific strategies for competing with Veeva, as well as the Company's assessment of its strengths and weaknesses in relation to Veeva.  Harbin is well aware of IMS's strategy for challenging Veeva.

77.     Harbin has this knowledge because he participated in extensive meetings where the specific purpose was to address how to compete with Veeva.  Specifically, shortly before his departure in 2014, Harbin participated in at least two separate strategy meetings – one of which was all-day -- where the key discussion topic was how to compete with Veeva through IMS offerings, including technical capabilities and commercial strategies and tactics.  The objectives of these meetings included developing an understanding of Veeva's likely strategy for the next three to five years, identifying the most likely tactics to deliver on this strategy, determining critical dependencies and potential hurdles for this strategy to be successful and,

most importantly, identifying IMS strategies to pursue in light of the assessment of Veeva's likely approach.

78.     At the day-long, Veeva-focused strategy meeting attended by Harbin on February 11, 2014, the participants actually split into IMS and Veeva "teams" to better anticipate Veeva's approach to the market and effective options for IMS to respond.  This meeting included an IMS plan of action and a gap analysis setting forth areas where IMS needed to strengthen its offerings, particularly compared to Veeva.  The meeting also had the attendees develop strategy and action items to close gaps identified, determine proactive steps needed going forwarded, and prepare a plan from the takeaways of the meeting.

79.     At the day-long meeting, IMS's and Veeva's CRM, MCM, and MDM offerings were also addressed and evaluated.

80.     As a result of his attendance in these Veeva strategy sessions shortly prior to his resignation of employment from IMS and commencement of employment with Veeva, Harbin knows in detail IMS's plans to challenge Veeva in the marketplace.  Harbin also knows IMS's assessment of the strengths and weaknesses of its offerings compared to Veeva's offerings and how IMS intends to compete against Veeva given those assessments.  His knowledge gained during these strategy planning sessions will allow Harbin to counter IMS's strategies with respect to Veeva, solely on the knowledge he acquired as an IMS employee.   It is not an overstatement to say that Harbin's abrupt departure from IMS to join Veeva is akin to counsel for a client switching to represent the other side on the eve of trial – with the former client's trial strategy in hand.

81.     Harbin also cannot claim that these Veeva strategy meetings were widely attended or contained generic analysis.  The first Veeva strategy meeting was attended by Harbin

and approximately ten other senior IMS employees.   The second telephonic meeting was
between only Harbin and one other employee.

82.     While Harbin may contend that he will not rely upon his knowledge of
IMS's plans and strategy while performing his responsibilities for Veeva, that simply is
inconceivable.   Harbin undoubtedly is not going to sit by quietly or idly if he is aware that the
activities of his new employer, Veeva, will not compete effectively with that of his former
employer, IMS.   It is not just a function of human nature that presents the risk.   It is the fact that
Harbin presumably is required to use his best efforts as an officer of Veeva and he assuredly is
expecting to use those best efforts as part of his job responsibilities.   Whether intentionally or
otherwise, there is no way that Harbin cannot allow his knowledge of what IMS has planned to
penetrate his strategic thinking – whether he expresses it to his new employer or not.

**G.     Defendant Leaves His Employment and Refuses to Affirm His Commitment to
Abide By His Agreement.**

83.     On or about May 20, 2014, Harbin abruptly announced his resignation
from IMS.   Despite his contractual obligations to IMS, Harbin refused to disclose to the
Company the nature of his job responsibilities at Veeva and, in his initial resignation
announcement, did not even mention that he had accepted employment at Veeva.

84.     On the same day of Harbin's resignation, Veeva issued a Press Release,
titled "Veeva Systems Introduces Commercial Cloud for Life Sciences."   Veeva's Press Release
touted its product as a "next-generation solution to redefine how life sciences companies go to
market."   Veeva's Press Release touted its CRM cloud solutions, as well as its marketing and
data management solutions – all products and offerings which compete with IMS and of which
Harbin has knowledge of trade secrets and confidential information.   Indeed, these were among

the very topics that were addressed in the strategic "role play" sessions in which Harbin had actively participated just weeks earlier before switching teams.

85.     On or about June 5, 2014, counsel for IMS contacted Harbin to advise him that his employment with Veeva constituted a breach of his obligations to the Company.  A copy of that correspondence is attached hereto as Exhibit C.

86.     On or about June 9, 2014, counsel for Veeva contacted IMS counsel.  He advised that Harbin was employed by Veeva as Vice President of Commercial Cloud Strategy but did not directly address IMS's inquiry regarding the nature of Harbin's job responsibilities. A copy of that correspondence is attached hereto as Exhibit D.

87.     Two days later, on or about June 11, 2014, counsel for IMS responded to Veeva's counsel, informing him that, based upon counsel for Veeva's identification of Harbin's new job title, it was apparent that Harbin's employment with Veeva constituted a breach of his obligations to IMS and that the Company was prepared to seek legal remedies.

88.     Despite multiple requests, Harbin and his lawyers refused to provide any substantive information regarding Harbin's job duties for Veeva or offer any meaningful explanation as to how his position would not cause him to directly compete with IMS.

89.     Upon information and belief, Harbin refused to disclose his job duties because he knew that he would be employed by Veeva in a competitive capacity and that his employment would be in violation of his contractual obligations to IMS.  There is no other good explanation for Harbin's or Veeva's unwillingness to share the requested information regarding Harbin's job responsibilities.

90.     IMS has subsequently learned that no job description existed for Harbin's position at Veeva at the time he accepted the offer.  It is odd, to say the least, that Veeva would

have hired a senior manager from a key competitor where they had no particular opening or job description, particularly when the hire occurred at the same time as a major announcement by Veeva with respect to their cloud offerings ostensibly designed to more effectively compete with IMS's IMS One platform.  Harbin's inability or refusal to disclose his job duties to IMS, coupled with the atypical nature of his hire, raises serious concerns about the intent behind his hire and Harbin's (and his new employer's) commitment to honor his contractual obligations.

91.     Upon information and belief, Veeva offered Harbin employment without requiring Harbin to go through its standard interview process because it recognized the value in hiring a key employee of its competitor so that it could benefit from the trade secrets and confidential information Harbin acquired while at IMS.

92.     Under the circumstances, in light of his title and refusal to provide even the most basic assurances and information, IMS reasonably believes that Harbin's employment with Veeva is in violation of his contractual obligations to the Company.

**H.     IMS Canada Initiates an Injunction Action in Canada, and the Court Suggests the Parties Proceed in Connecticut Under the 2013 Restrictive Covenant Agreement**

93.     On June 30, 2014, IMS Canada, a wholly-owned subsidiary of IMS, initiated a civil action against Harbin and Veeva in the Superior Court of Justice sitting in Ontario, Canada.  In 2008, IMS Canada entered into an agreement with Harbin, which contained certain restrictive covenants, and IMS Canada's lawsuit sought enforcement of those covenants.

94.     On July 4, 2014, after limited discovery, counsel for IMS Canada and Harbin participated in oral argument at a hearing before a Superior Court judge.  At the hearing, which did not have live testimony, one of Harbin's main arguments was that his 2013 Restrictive Covenant Agreement with IMS superseded his 2008 agreement with IMS Canada, thus rendering the Canadian court an inappropriate forum to adjudicate the action.

95.     On July 21, 2014, the Superior Court judge issued its decision.  The Superior Court determined that there was a factual question whether, as Harbin argued, the 2013 Restrictive Covenant Agreement with IMS superseded the Canadian Agreement, and declined to enforce the non-competition provision of the Canadian Agreement.

96.     The Superior Court decision suggested that Connecticut may be the proper forum to interpret and enforce the 2013 Restrictive Covenant Agreement, which was not at issue in the Canada action.

97.     Consistent with the Superior Court decision, IMS initiated this action to protect its rights and to have a court sitting in the jurisdiction that the parties agreed is proper for the interpretation of the 2013 Restrictive Covenant Agreement enforce the terms of the Agreement and protect IMS's rights.

**I.      Harbin's Employment With Veeva is a Direct Threat to IMS.**

98.     Given the intimate knowledge that Harbin has about IMS's business and strategies, it is apparent that his responsibilities at Veeva as Vice President – Cloud Services will require him to draw on and leverage information that he learned as a trusted fiduciary of IMS.

99.     Harbin knows what works and, just as importantly, what does not work (so-called "negative know how") in the marketing and development of cloud-based solutions in the BI, CRM, MDM, and MCM businesses.  Harbin will necessarily have to rely upon that knowledge, acquired through his employment at IMS, in the performance of his duties for Veeva.  Harbin will not be able to simply "shut off" his knowledge in these areas gained from working at IMS.  Nor will Harbin suggest strategies for Veeva that he already considered while working for – and on the payroll of – IMS and which through trial or experience he knows did not work.  Indeed, Veeva likely hired him because of the expertise he acquired through his employment at IMS and is generously compensating him to lead their cloud business.  It is

inconceivable, given his responsibilities for Veeva, that Harbin could just choose to forget or not rely upon knowledge he gained at IMS when performing comparable duties for Veeva.

100.    Harbin cannot simply forget his knowledge of IMS's BI, CRM, MDM and MCM businesses and IMS One.  These are areas where Veeva and IMS directly compete, and where Veeva would expect Harbin to add value by using his prior experiences at and knowledge from IMS to strengthen Veeva's offerings.

101.    Harbin, through a sworn Affidavit in the Canadian Action, demonstrates how he cannot faithfully perform his job duties for Veeva without inevitably disclosing IMS confidential information.  There, Harbin states that he is "responsible for understanding the market for Veeva's offerings and giving guidance to sales teams on how to message Veeva's products."  It is inconceivable that Harbin's guidance for products that directly compete with IMS products in the marketplace cannot reflect Harbin's knowledge of those IMS products.  It is similarly inconceivable that Harbin's guidance as to customers whose needs he has been exposed to while at IMS will not reflect Harbin's IMS-based knowledge.  For example, based on his insider IMS information, he knows how to best differentiate Veeva products from IMS and he is aware of what are perceived weaknesses of IMS products that Veeva can then attempt to exploit. Harbin cannot shut off the part of his memory that houses this information, nor can he serve Veeva to the best of his ability without using that knowledge in the performance of his job duties.

102.    By way of another example, Harbin became intimately aware of IMS's One and Nexxus strategy, offerings and implementation plans.  One area of focus for him toward the end of his tenure with IMS was in CRM, which forms a key pillar of the IMS Nexxus Sales capability.  The Veeva Commercial Cloud is positioned by Veeva as analogous to IMS One and

Nexxus.  It is inconceivable that Harbin could participate in the development, marketing and success of Veeva Commercial Cloud without drawing from his knowledge of IMS One and Nexxus.

103.    By way of another example, from January through April 2014, Harbin participated in at least two separate meetings where one of the key discussion topics was how to compete with Veeva, including technical capabilities and commercial strategies and tactics.  The information discussed at these sessions is extremely valuable to a corporation such as Veeva looking to gain an unfair advantage over a rising competitor such as IMS.  Since IMS and Veeva both offer CRM/CLM and MDM products to their customers and clients, Harbin's knowledge of IMS pricing strategies, marketing strategies, acquisition strategies and data strategies, as well as IMS's specific plans for competing directly against Veeva, gives Veeva an unfair competitive advantage over  IMS.  Harbin cannot forget or compartmentalize his knowledge of these meetings or otherwise claim that his knowledge would not be of value in his position for Veeva.

104.    Veeva would receive a tremendous unfair competitive advantage by employing Harbin during the period of his IMS non-competition obligation.  Veeva would learn details of IMS's CRM and MDM businesses, without investing the hundreds of thousands of dollars, time commitment, or physical materials that IMS invested in creating those processes.

105.    IMS will be irreparably harmed if Defendant is permitted to violate the 2013 or 2008 Restrictive Covenant Agreement.  IMS's trade secrets and confidential information in the realm of its BI, CRM, MDM and MCM businesses would be disclosed and/or used, likely inevitably (consciously or otherwise), by Veeva.  The very purpose of the Restrictive Covenants Agreements was to ensure that Harbin would not present such a risk of harm to IMS.  And,

without restricting his employment, IMS has no way of policing Harbin's compliance with his obligations – even if such compliance were possible.

106.     IMS must be afforded the benefit of the non-competition period so that Harbin's memory can fade, information can grow stale over time, and IMS can take the requisite measures to protect itself, to identify a replacement who can be a new face of IMS, and to provide that replacement with at least some of the training and opportunities that IMS provided to Harbin for significant compensation.  Otherwise, Veeva would be able to unfairly compete by capitalizing on IMS's goodwill (through Harbin) and Harbin's knowledge of IMS's confidential information and trade secrets (which are not known to the general industry), without ever having made the type of investment that IMS has made to obtain success in the commercial market.

107.     Further, Harbin's effort to circumvent his obligations to IMS by refusing to respond to multiple requests regarding his duties and responsibilities at Veeva clearly demonstrates that he is likely to compete with IMS and disregard his contractual and common law obligations to IMS.   Indeed, if Harbin were confident that his performance of job responsibilities for Veeva was not a potential problem, there is no conceivable reason that he could not have been forthright upon having been requested to provide such information.

108.     Although IMS cannot calculate the value of the harm caused by Harbin's contravention of the 2013 and 2008 Restrictive Covenant Agreements through his employment by a competitor, it is clearly in excess of $75,000.00 given the value of IMS's goodwill and the trade secrets and other confidential agreement that Harbin can now use for a competitor's benefit.

## COUNT I

### BREACH OF THE 2008 RESTRICTIVE COVENANT AGREEMENT

109.    Paragraphs 1 through 108 are incorporated by reference as if set forth fully therein.

110.    Harbin continues to be bound by his 2008 Restrictive Covenant Agreements, which is an enforceable contract between him and IMS.

111.    Harbin's 2008 Restrictive Covenant Agreements prohibits him from working for a competitor of IMS.

112.    Veeva is a direct competitor of IMS that competes against IMS in the exact spaces where Harbin has knowledge of IMS's trade secrets and confidential information.

113.    Upon information and belief, Harbin has accepted employment with Veeva and his job duties for Veeva are similar to the job duties he performed while employed by IMS.

114.     Harbin's breach of his 2008 Restrictive Covenant Agreement threatens immediate and irreparable harm to IMS.

115.    IMS has no adequate remedy at law, and will continue to suffer substantial and immediate irreparable harm unless Harbin is enjoined as requested below.

116.    Greater injury will be inflicted on IMS by the denial of the relief requested herein than will be inflicted on Harbin by the granting of this relief.

## COUNT II

### BREACH OF THE 2013 RESTRICTIVE COVENANT AGREEMENT

117.    Paragraphs 1 through 117 are incorporated by reference as if set forth fully therein.

118.    Harbin continues to be bound by his 2013 Restrictive Covenant Agreements, which is an enforceable contract between him and IMS.

119.    Harbin's 2013 Restrictive Covenant Agreements prohibits him from working for a competitor of IMS.

120.    Veeva is a direct competitor of IMS that competes against IMS in the exact spaces where Harbin has knowledge of IMS's trade secrets and confidential information.

121.    Upon information and belief, Harbin has accepted employment with Veeva and his job duties for Veeva are similar to the job duties he performed while employed by IMS.

122.    Harbin's breach of his 2013 Restrictive Covenant Agreement threatens immediate and irreparable harm to IMS.

123.    IMS has no adequate remedy at law, and will continue to suffer substantial and immediate irreparable harm unless Harbin is enjoined as requested below.

124.    Greater injury will be inflicted on IMS by the denial of the relief requested herein than will be inflicted on Harbin by the granting of this relief.

## COUNT III

## <u>VIOLATION OF CONNECTICUT UNIFORM TRADE SECRETS ACT</u>

125.    Paragraphs 1 through 124 are incorporated by reference as if fully set forth herein.

126.    Upon information and belief, Harbin will, inevitably or intentionally, disclose to Veeva, or use on behalf of Veeva and for Veeva's exclusive benefit, confidential information and trade secrets of IMS without the express or implied consent of IMS.

127.    Harbin's conduct has been willful and outrageous and undertaken with reckless indifference to the rights of IMS.

128.    The foregoing activities of Harbin constitute unfair trade practices pursuant to Conn. Gen. Stat. § 35-51 et seq.

129.    By virtue of Harbin's misappropriation of IMS's trade secrets for the benefit of Veeva, IMS is threatened with immediate and irreparable harm.

130.    IMS will suffer irreparable harm if Harbin is not enjoined from continuing to violate Conn. Gen. Stat. § 35-51 et seq.

131.    Greater injury will be inflicted upon IMS by the denial of the relief requested herein than will be inflicted on Harbin by the granting of such relief.

## PRAYER FOR RELIEF

WHEREFORE, IMS requests the following relief:

(a)     Harbin be enjoined, preliminarily until hearing, and thereafter indefinitely, from accepting employment or otherwise performing services for Veeva or any other competitor of IMS.

(b)     Harbin be enjoined, preliminarily until hearing, and thereafter indefinitely, from using or presenting any of IMS's trade secrets or proprietary and confidential information to Veeva or to any other party other than IMS.

(c)     Harbin be directed to immediately return to IMS all Company documents and information, with the exception of documents and information pertaining to Harbin's personal compensation.

     (d)      Harbin be ordered to promptly produce copies of all such Company documents during the expedited discovery process related to Plaintiff's Motion for Preliminary Injunction and Other Relief.

     (e)      Harbin be directed to pay actual damages, compensatory damages, punitive damages, pre-judgment interest, and post-judgment interest.

     (f)      Harbin be directed to pay the costs of these proceedings.

     (g)      This Court order such other and further relief, including attorneys' fees and costs as it deems appropriate.

Dated: July 29, 2014                    Respectfully submitted,

                              /s/ Anthony R. Minchella
                              Anthony R. Minchella, Esq. (ct18890)
                              John E. Doran, Esq. (ct 29427)
                              Minchella & Associates, L.L.C.
                              530 Middlebury Road
                              Ste. 209B
                              Middlebury, CT  06762
                              203-758-1069
                              aminchella@minchellalaw.com
                              jdoran@minchellalaw.com

                              Richard G. Rosenblatt
                              Jonathan S. Krause (*pro hac vice* forthcoming)
                              MORGAN, LEWIS & BOCKIUS LLP
                              1701 Market Street
                              Philadelphia, PA 19103
                              215-963-5511/5510
                              rrosenblatt@morganlewis.com
                              jkrause@morganlewis.com

                              *Attorneys for Plaintiff*
                              *IMS Health Incorporated*